Filed 9/21/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| STEPHANIE KOUSSAYA, | C089159 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UNPI-2016-0003703) |
| v. | |
| CITY OF STOCKTON et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Barbara A. Kronlund, Judge. Affirmed.

Piering Law Firm, Robert A. Piering, John D. Beals; and Leslie M. Mitchell for Plaintiff and Appellant.

Angelo, Kilday & Kilduff and John A. Whitesides for Defendants and Respondents.

1

Stephanie Koussaya was taken hostage, along with two other women, by three armed bank robbers, Alex Martinez, Jaime Ramos, and Gilbert Renteria, Jr. Used as human shields in order to facilitate the robbers' escape from the bank, the hostages were forced into a Ford Explorer belonging to one of the hostages, Kelly Huber. A high-speed chase with law enforcement followed. For Huber, the chase ended abruptly when she was pushed out of the vehicle after Ramos shot her in the leg, apparently by mistake. For Koussaya and the other hostage, Misty Holt-Singh, the pursuit lasted for more than an hour, reaching speeds of over 100 miles per hour, and included exchanges of gunfire between Martinez, who was firing an AK-47 assault rifle out of the back of the Explorer, and two Stockton Police Department (SPD) officers, Captain Douglas Anderson and Officer Edward Webb. The details of the chase will be set forth more fully later in this opinion. For present purposes, we note Koussaya ultimately decided her best chance at surviving the ordeal was to open one of the rear side doors and throw herself from the moving vehicle. As Koussaya explained, having already heard multiple rounds hit the Explorer during the pursuit, she believed that if she did not jump from the vehicle she would be killed by the special weapons and tactics (SWAT) team when the chase inevitably came to an end. Minutes after Koussaya's escape, the chase did come to an end, at which point police officers fired several hundred rounds into the Explorer, killing two of the robbers and the remaining hostage.

Having sustained serious injuries during her escape from the Explorer, Koussaya sued the City of Stockton and its police department (collectively, the City), as well as Captain Anderson and Officer Webb (officer defendants), asserting causes of action for assault and battery, intentional infliction of emotional distress (IIED), and general

2

negligence.[1]  The City and officer defendants filed separate motions for summary judgment.  The trial court granted the motions and entered judgment in favor of defendants.  Koussaya appeals.

We affirm.  As we explain, although the trial court abused its discretion in ruling on an evidentiary matter and also misapplied the Government Claims Act (Gov. Code, § 810 et seq.)[2] to improperly limit the scope of Koussaya's claims, taking into account the improperly excluded evidence and properly viewing the factual basis of her claims against the officer defendants and the City, we conclude each defendant was entitled to judgment as a matter of law.

## BACKGROUND

In accordance with the standard of review, we recite the facts in a light favorable to Koussaya as the losing party.  (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

### *Bank Robbery and Initial Pursuit*

In July 2014, Koussaya worked as a bank teller at a Bank of the West location in Stockton.  The bank was situated between three major roads that came together to form a triangle, Hammer Lane, Thornton Road, and Lower Sacramento Road.  On July 16, three armed men, Martinez, Ramos, and Renteria, robbed the bank.  Another bank employee activated a silent alarm upon their arrival.

Officer Darren Sandoval was on patrol not far from the bank when he heard dispatch notify another nearby officer, Officer Denise Egan, about the robbery in progress.  Sandoval self-deployed to the bank, activating his patrol car's emergency lights

---

[1]    Koussaya initially named other SPD officers as defendants, but voluntarily dismissed the lawsuit against them because they did not fire upon the Explorer while Koussaya was still a passenger therein.

[2]    Undesignated statutory references are to the Government Code.

3

and siren until he was about a quarter-mile from the bank, at which point he turned off the siren but kept the emergency lights activated. Sandoval was the second officer to arrive at the bank. As he approached, he heard Officer Egan notify dispatch there were three suspects inside the bank. Sandoval pulled into the bank parking lot from Lower Sacramento Road and parked his patrol car in front of the bank. He correctly assumed Egan was located on the Thornton Road side of the bank and intended to assist in setting up a perimeter.

At least three additional SPD officers also responded to the bank. Two joined Officer Egan blocking the exit onto Thornton Road. One of these officers, Officer Anisko, traveled to the bank with emergency lights and siren, but deactivated the siren when he approached the bank. Egan activated only her emergency lights and positioned her patrol car to block the main exit onto Thornton Road. The third, Officer Zavala, joined Officer Sandoval on the Lower Sacramento Road side of the bank, blocking that exit. No one blocked the drive-through ATM exit.

As Officer Sandoval got out of his patrol car and positioned himself next to his driver's side front tire in front of the bank, he noticed an elderly man walking through the parking lot and warned him away from the bank. Sandoval then saw the three robbers exiting the bank with a hostage, Huber. One of the robbers held Huber by the arm from behind and held a handgun to her chin; the other two followed in a triangle formation. Sandoval pointed his service pistol at the lead robber and issued several commands for the robbers to stop, put their weapons down, and get down on the ground. After some momentary hesitation, the robbers retreated back into the bank with Huber.

Officer Sandoval holstered his handgun and ran to the trunk of his patrol car to retrieve a rifle while updating dispatch about the situation. As he started to position himself with the rifle behind a tree near his vehicle, the robbers again emerged from the bank, this time with three hostages, Huber, Koussaya, and Holt-Singh. Abandoning his position behind the tree and again taking aim at the lead robber with his service pistol,

4

Sandoval issued several more commands for the robbers to stop and threatened to "blow their heads off." These commands were ignored. The robbers moved slowly towards Sandoval with the hostages and ultimately moved past him, making their way to Huber's Ford Explorer.

Inside the Explorer, Huber got behind the wheel and was ordered to drive. She did so, exiting the parking lot via the drive-through ATM lane and turning north onto Thornton Road. Officer Sandoval ran to his patrol car and followed in pursuit, as did other police units. Less than a minute into the pursuit, one of the robbers, Ramos, shot Huber in the leg, apparently by mistake. The Explorer then slowed and Huber was pushed out of the vehicle. Ramos's cohort, Renteria, got behind the wheel and the chase continued.

Officer Sandoval was directly behind the Explorer as they approached Davis Road less than a mile from the bank. The Explorer's back window shattered in front of him as the third robber, Martinez, fired a barrage of bullets from an AK-47 assault rifle out of the back of the SUV. Multiple rounds hit Sandoval's front tires and grille, disabling his steering and ending his participation in the pursuit.

### *Overview of the Remainder of the Pursuit*

The pursuit would continue for more than an hour, reaching speeds of over 100 miles per hour, traversing about 60 miles back and forth between Stockton and Lodi, and involving over 30 police cars. After Officer Sandoval's vehicle was disabled, other police cars took its place as the lead pursuer. One by one, these vehicles were either disabled by additional rounds fired out of the back of the Explorer or fell back to avoid taking further gunfire.

SPD commanders monitored the pursuit through radio traffic and were able to view segments of the pursuit through the City's traffic camera system. Their main objective was to get the SWAT team to the front of the pursuit to find a tactical means of disabling the Explorer. The number of police vehicles involved in the pursuit made this

5

difficult. So did SPD's lack of air support. Eventually, however, a San Joaquin County Sheriff's Department aircraft arrived to provide air support for the pursuing officers on the ground.

Lieutenant Ivan Rose was given tactical command of the pursuit. However, this information was not clearly communicated to the officers engaged in the pursuit, including Rose apparently, who testified in his deposition that Lieutenant Ridenour was in command of the pursuit. Other officers also had different understandings with respect to who was in charge. For example, one of the SWAT sergeants believed Lieutenant Pickens was in command. At one point during the pursuit, Ridenour and Pickens gave conflicting orders with respect to whether or not to put down a spike strip to attempt to disable the Explorer. The spike strip was not deployed. At another point, Ridenour ordered officers not to shoot at or ram the Explorer. However, Rose understood this order to not apply to the SWAT team and thereafter unsuccessfully tried to ram the Explorer with the SWAT team's armored vehicle. Another SWAT sergeant testified: "I don't believe there was one specific person that had tactical control of this."

At different times during the pursuit, two SPD officers, Captain Anderson and Officer Webb, fired at Martinez in the back of the Explorer. We recount the details of these officers' participation in the pursuit immediately below.

### Captain Anderson's Participation in the Pursuit

Captain Anderson was at SPD headquarters when he was informed about the bank robbery and ongoing police pursuit. He was tasked with assisting in the investigation at the bank and left in an unmarked police car to do so. Anderson took Highway 99 north towards Hammer Lane on his way to the bank, but heard over the radio that the pursuit was further north on Highway 99 and heading south. Rather than go to the bank, Anderson decided to continue past Hammer Lane and exit the freeway at Morada Lane in case the robbers decided to use that exit as an "escape route."

6

Captain Anderson parked his car along the southbound onramp and waited for the pursuit to reach him. From this location, he had a clear view of the offramp the Explorer would take if it exited the freeway. As Anderson suspected, the Explorer took the exit. According to Anderson's deposition testimony, it appeared as though the Explorer stopped on the offramp. He also saw Martinez lean his body out of the back of the SUV, "brace[] himself on the tailgate section and put the AK-47 out towards the -- whatever would be coming around that corner next off the offramp." Fearing the robbers were attempting to set an ambush for the pursuing police vehicles, Anderson took aim at Martinez with his service pistol and fired three rounds. In response, Martinez began "firing indiscriminately" and then started to withdraw back into the SUV as the vehicle continued forward. Anderson fired two more rounds as Martinez withdrew into the Explorer.

The Explorer then drove around a car that was ahead of it on the offramp, followed by the pursuing officers. Officer Zavala was the lead pursuer at this point in the pursuit. His patrol car was struck by three rounds fired by Martinez. Like Captain Anderson, Zavala also testified during his deposition that the Explorer stopped on the offramp. However, as Zavala acknowledged during his deposition testimony, surveillance video capturing the shooting did not depict the Explorer stopping on the offramp.

At the time Captain Anderson fired at Martinez in the back of the Explorer, he was aware of a general order issued by the SPD regarding situations in which officers are prohibited from firing at moving or fleeing vehicles.[3] He did not believe that general order applied to this situation, however, because he was firing at Martinez, rather than the Explorer itself, in an attempt to stop Martinez from firing at the pursuing officers.

---

[3] The contents of this and other relevant SPD general orders will be set forth later in the opinion.

Anderson was also aware of Lieutenant Ridenour's specific order, broadcast over the police radio, not to shoot at the Explorer, but believed that was "just a heads-up" to "keep in mind there's hostages in there." Anderson believed the circumstances demanded the action he took in shooting at Martinez regardless of the presence of hostages in the vehicle.

### *Officer Webb's Participation in the Pursuit*

Officer Webb was involved in K-9 training at the San Joaquin County Fairgrounds when the bank robbery occurred. Webb self-deployed to the pursuit and monitored its location over the radio. By the time he caught up to the pursuit, it had been going for about 30 minutes.

The Explorer was heading north on Interstate 5 (I-5) near the Highway 12 exit in Lodi when Officer Webb first saw the fleeing vehicle. Webb was located at that exit waiting to see where the robbers went from there. When the Explorer exited the freeway and then got back onto I-5 heading south, Webb managed to pull in behind it as the lead pursuer.

Officer Webb followed the Explorer south on I-5 back to Stockton and was twice told by air support: "Back off, you're getting too close." Webb briefly lost sight of the Explorer as it took the exit at Benjamin Holt Drive; his patrol vehicle began taking gunfire on the exit ramp as he followed in pursuit. Webb believed the robbers had set an ambush for him there. He quickly pulled his car to the right and stopped, got out of the car, and pulled out his service pistol. Using the driver's side door to take aim, Webb fired two rounds at Martinez from a distance of about 150 feet. The Explorer then continued forward and made a left turn onto Benjamin Holt Drive. Webb got back into his car and followed but was no longer the lead pursuer.

At the time Officer Webb fired, he was unaware of the general order noted above and did not hear Lieutenant Ridenour's specific order not to shoot at the Explorer.

However, he believed he was justified in firing at Martinez because he was taking fire on the off ramp and returning fire in self-defense.

### Koussaya's Escape From the Explorer

When Koussaya became aware of the SWAT team's participation in the pursuit, she decided her best chance of survival was to throw herself out of the moving Explorer. She did so on Portola Avenue, about two miles from where Officer Webb fired at the Explorer. As Koussaya explained during her deposition, having heard multiple rounds hit the Explorer, she believed that if she did not jump from the vehicle she would be killed by the SWAT team when the chase inevitably came to an end. The Explorer was moving at a high rate of speed when Koussaya jumped. She sustained serious injuries as her body was flung across the roadway "like a rag doll."

Minutes after Koussaya's escape, the chase did come to an end, at which point police officers fired several hundred rounds into the Explorer, killing two of the robbers, Martinez and Renteria, and the remaining hostage, Holt-Singh.[4]

### Koussaya's Lawsuit

Koussaya sued the City and officer defendants asserting three causes of action: (1) assault and battery; (2) IIED; and (3) general negligence. Because the operative complaint delimits the scope of the issues cognizable in this appeal, we describe it in some detail. (See *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 [" 'function of the pleadings in a motion for summary judgment is to delimit the scope of the issues' "].)

After setting forth the facts of the robbery, the police response at the bank, the ensuing pursuit, and Koussaya's escape from the Explorer, the complaint alleges "the

---

[4] Ramos survived the assault on the Explorer, pleaded guilty to first degree murder under a felony-murder theory, and is currently incarcerated at Pelican Bay State Prison. (See *People v. Ramos* (Nov. 7, 2018, C084516) [nonpub. opn.].)

hostage situation would not have arisen if the defendants, and each of them, had followed their own armed robbery protocols and general orders." The complaint alleges: "Had the police followed general orders and proper protocol and remained inconspicuous until the robbers were away from the innocent victims, none of the victims would have been taken hostage and made to suffer the physical, emotional and permanent harms sustained as alleged more particularly below." "Instead," the complaint continues, "hostages were taken, one hostage was killed by the police, another victim was shot in her right leg and [Koussaya] was compelled to jump out of a moving car because of the police pursuit and bullets being shot into the car by the defendants." The complaint alleges Koussaya's injuries, set forth in greater detail later in the complaint, "were a direct and foreseeable harm resulting from defendants' failure to exercise the duty of care owed to [her], by both their intentional use of deadly and excessive force and in the use of deadly weapons in attempting to pursue the vehicle [she] was known to be in."

The complaint additionally alleges the City, "by and through its supervisory employees and agents," breached "a mandatory duty of care to properly and adequately hire, train, retrain, supervise, and discipline its police officers . . . so as to avoid unreasonable risk of harm." The alleged breach occurred when the City and its police officers "failed to take necessary, proper, and/or adequate measures to prevent the violation of [Koussaya's] rights and violated general orders and standard bank robbery procedures in their response to the robbery and pursuit of the robbers." The complaint continues: "The lack of supervisorial training demonstrates the existence of a formal or an informal custom, policy or practice of promoting, tolerating, and/or ratifying with deliberate indifference the continued use of deadly and excessive force against suspects, detainees and in particular, [Koussaya], by the defendants, and each of them."[5]

---

[5] The complaint also faults SPD for failing to adequately investigate a previous robbery committed by two of the robbers at the same bank, resulting in these robbers

10

After reciting various procedural matters pertaining to Koussaya's compliance with the Government Claims Act and describing a stipulation entered into between the City and Koussaya in the federal bankruptcy court regarding Koussaya's ability to proceed with this lawsuit notwithstanding the City's 2013 bankruptcy, the complaint lists the three causes of action:  "Assault and Battery," "Intentional Infliction of Emotional Distress," and "General Negligence."  Under each cause of action, the complaint incorporates all of the foregoing paragraphs of the complaint by reference and alleges the defendants' "above-described conduct constituted assault and battery" and "intentional infliction of emotional distress," and their "above-described [conduct] and/or omissions were negligent and careless in violation [of] both state and federal laws and otherwise breached duties of reasonable care."

### *Summary Judgment Motions*

The City and officer defendants filed separate motions for summary judgment. The City argued the claim Koussaya filed with the City under the Government Claims Act specifically listed only the police response at the bank and officers shooting at the fleeing Explorer as the basis for her claims of tort liability, and therefore additional conduct alleged in the complaint, such as "any wrongdoing, other than shooting, related to pursuing the robbers" or "insufficient officer training or supervision in any regard," are not properly preserved for adjudication.  The City also argued immunity from direct liability for negligent training or supervision of its officers because Koussaya did not allege any statute or regulation imposing a duty on the City to protect her from being taken hostage or incurring injury during the high-speed pursuit that followed.

With respect to the City's vicarious liability based on the officers' response at the bank, the City first argued Officer Sandoval's attempt to arrest the robbers when they

---

repeating "virtually the exact same crime at the same location . . . without fear of being caught."  However, this ground of alleged liability has been abandoned and we mention it no further.

initially emerged from the bank with Huber could not support liability for assault, battery, or IIED for several reasons:  (1) Sandoval had probable cause to arrest the robbers at that point in time and legal authority to threaten deadly force in an attempt to do so; (2) Sandoval's threatened use of force complied with federal constitutional standards; (3) Koussaya was not present when the arrest attempt occurred and therefore could not have feared harmful bodily contact or been offended by the officer's attempt to arrest the robbers and free Huber; (4) Sandoval's arrest attempt did not result in any contact with Koussaya at all; (5) far from being " 'extreme and outrageous,' " Sandoval's attempt to arrest the robbers was laudable; and (6) the arrest attempt was "statutorily-authorized and thus privileged."

Turning to Koussaya's vicarious negligence claim based on the police response at the bank, the City argued: (1) the responding officers owed no duty to protect Koussaya from being taken hostage; (2) even if a general duty of reasonable care arose because their conduct increased the risk of peril to Koussaya, that conduct did not amount to a breach of the standard of care; and (3) discretionary immunity under section 820.2 applied to shield the officers from liability.

With respect to vicarious liability based on the officers' conduct during the pursuit, the City again argued Koussaya did not preserve any pursuit-related claim except as relating to the officers who shot at the Explorer.  However, assuming other pursuit-related conduct could be used to support tort liability, the City argued:  (1) the officers who joined in the pursuit owed no duty to refrain from doing so; (2) the officers' respective decisions to join in the pursuit were reasonable; and (3) even if certain officers engaged in unreasonable conduct during the pursuit, "those officers are immune from all pursuit-related liability" under Vehicle Code section 17004.

Finally, turning to Koussaya's vicarious claims against the City based on Captain Anderson and Officer Webb firing at the Explorer during the pursuit, the City argued:  (1) the trial court should grant the officer defendants' separate motion for summary judgment

12

for the reasons argued therein; and (2) in the alternative, section 845.8, subdivision (b)(3) provides "immunity against liability for injury caused by a person fleeing, or resisting, arrest" and Koussaya's injuries were caused by the robbers' resistance to and flight from the officers who were lawfully attempting to take them into custody following the bank robbery.

As mentioned, the officer defendants filed a separate motion for summary judgment. Relying primarily on *Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675 (*Lopez*), they argued the following undisputed facts established the reasonableness of their respective decisions to fire upon Martinez in the back of the Explorer: "At the times Webb and Anderson shot at Martinez, each officer encountered the same essential situation: persons who the officer believed had committed multiple violent felonies (armed robbery, kidnapping, carjacking, assault with a deadly weapon, and attempted murder) were fleeing from arrest, plus Martinez was shooting at that officer (Webb) or visibly preparing to shoot at other officers (Anderson) in public areas with nearby citizen motorists. Each officer knew that the suspects had already shot and ejected one hostage (Huber) and had fired multiple times at other officers. Accordingly, deploying deadly force against Martinez to stop his further attack was both legally authorized and reasonable, despite the risks posed to the hostages seated nearby." With respect to the manner of shooting, the officer defendants argued "neither Webb nor Anderson allegedly or actually aimed at Koussaya, nor fired an excessive number of shots," and "[e]ach officer ceased firing after the immediate threat posed by Martinez subsided (albeit only temporarily)."

The officer defendants then addressed a line of authority holding that preshooting conduct may be considered, as part of the totality of circumstances, in determining the reasonableness of the shooting itself (see, e.g., *Hayes v. County of San Diego* (2013) 57 Cal.4th 622 (*Hayes*); *Munoz v. Olin* (1979) 24 Cal.3d 629 (*Olin*); *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575 (*Grudt*)), and argued these decisions did not support

13

Koussaya's contention that the allegedly unreasonable conduct of the officers who responded to the bank created the need for Webb and Anderson to later shoot at Martinez, "thus rendering those shootings unreasonable."

Finally, the officer defendants also argued: (1) Koussaya did not preserve any claim based on their pursuit of the robbers, other than shooting at Martinez, and even if she did, Anderson never pursued the robbers and Webb lacked a duty to refrain from doing so; (2) any pursuit-related liability is precluded by both section 820.2 and Vehicle Code section 17004; and (3) section 845.8, subdivision (b)(3) also provided them with immunity from liability because Koussaya's injuries were caused by the robbers' violent resistance to and flight from the pursuing officers.

### Koussaya's Opposition to the Motions

Koussaya opposed the motions. In response to the City's motion, Koussaya disclaimed any attempt to hold the City directly liable on a negligent training or supervision theory, but argued all vicarious liability claims based on the entirety of the officers' conduct, including their response to the bank, pursuit of the robbers, and shooting at the Explorer with hostages in the vehicle, were adequately preserved for adjudication. With respect to those claims, Koussaya argued disputes of material fact existed precluding the trial court from granting the City's motion. Taking issue with the City's analysis dividing her claims into separate distinct actions undertaken by police, i.e., the response to the bank, the pursuit, and the shootings, Koussaya argued the entirety of the officers' conduct should be analyzed as "a continuing and escalating series of events that resulted in Koussaya being forced to throw herself out of a speeding car to avoid being killed by the police." Relying on the case law noted above, Koussaya argued disputes of material fact existed with respect to whether or not the City's officers breached their duty to exercise reasonable care throughout these events, the totality of which included the use of deadly force and resulted in Koussaya leaping from the moving Explorer and sustaining serious injuries.

14

As evidence of the officers' breach of the standard of reasonable care, Koussaya relied on four SPD general orders governing responding to robbery alarms, engaging in vehicle pursuits, use of firearms, and responding to an active shooter situation.[6] Koussaya also relied on certain findings contained in an after-incident report published by the Police Foundation, including that organization's conclusion that the "lack of planning, along with the number of officers involved, created a level of chaos that was difficult to manage and overcome," noting the City's police chief, Eric Jones, "adopted its findings as accurate."

Koussaya further relied on a declaration submitted by Roger Clark, a retired lieutenant with the Los Angeles County Sheriff's Department, who offered an expert opinion that both Captain Anderson and Officer Webb acted unreasonably in firing at Martinez in the back of the Explorer with hostages in the vehicle. Finally, Koussaya argued a material factual dispute existed with respect to whether these officers were the only SPD officers who fired at the Explorer while she was in the vehicle, pointing out that she testified in her deposition to hearing 15 to 20 rounds hit the Explorer and the shots fired by Anderson and Webb accounted for only seven rounds.

In response to the officer defendants' motion, Koussaya again argued material factual disputes existed with respect to whether or not Captain Anderson and Officer Webb acted reasonably in firing at Martinez with hostages in the Explorer, the result of which was Koussaya leaping from the vehicle and sustaining serious injuries. In addition to the general orders governing vehicle pursuits and use of firearms, Koussaya relied on Lieutenant Ridenour's specific order not to shoot at the Explorer, arguing these orders are evidence of the applicable standard of care and the officer defendants breached that standard of care when they disregarded the orders and fired at Martinez. She also again

---

[6] Relevant portions of these general orders will be set forth in the discussion portion of this opinion.

relied on her expert's declaration opining that Anderson and Webb acted unreasonably in doing so. Koussaya argued these material factual disputes prevented the trial court from granting summary judgment with respect to not only her negligence claim, but also her intentional tort claims.

Finally, Koussaya argued the officer defendants were not entitled to "fleeing suspect" immunity under section 845.8, subdivision (b)(3), because her injuries were not caused by the fleeing robbers, but were rather caused by her jumping from the moving Explorer in order to avoid being killed by bullets fired by the police.

### *The Trial Court's Rulings*

The trial court granted the summary judgment motions.

After ruling in the City's favor with respect to two preliminary matters, both of which we describe more fully in the discussion portion of the opinion, the trial court addressed Koussaya's first cause of action for assault and battery, setting forth the elements of these separate torts and noting that law enforcement may use reasonable force to make an arrest, prevent a suspect's escape, or overcome resistance. The trial court also explained section 820.2 immunizes an officer from all tort liability for discretionary decisions, such as the decision to make an arrest, but not ministerial actions, such as using excessive force in making the arrest. The trial court then followed the City's lead in dividing the officers' conduct into three categories, "(1) conduct of officers responding to the bank robbery, (2) conduct during the ensuing pursuit, and (3) conduct of officers who fired on the vehicle during the pursuit," and concluded as a matter of law that none of this conduct supported liability for assault or battery.

Turning to Koussaya's negligence claim, the trial court acknowledged that SPD general orders are relevant to the question of whether an officer's conduct has breached the standard of reasonable care, but concluded as a matter of law that the officers' conduct in the three categories noted above was either reasonable because the officers had "probable cause to believe the [robbers] pose[d] a significant danger to the safety of

16

the officer or others," or the officers "were acting within their discretion and are thus immune from liability." Finally, addressing Koussaya's IIED claim, the trial court concluded as a matter of law that none of the officers "engaged in any 'outrageous' conduct, or acted with intent or reckless disregard for the likelihood of causing emotional distress."

With respect to the officer defendants' motion, the trial court reached the same conclusions for the same reasons, but more specifically addressed the reasonableness of these officers' conduct during the two shooting incidents. Relying on *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501 (*Hernandez*), *Lopez*, *supra*, 196 Cal.App.4th 675, and *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516 (*Brown*), the trial court explained: "In this case, the undisputed evidence shows that at all times relevant to this case, [officer defendants] had probable cause to believe the robbers posed an imminent threat to the safety of the hostages, fellow officers, and the public. The robbers were armed, had taken hostages, had already shot one hostage, and were shooting at police during a high-speed pursuit through residential areas. All of the evidence shows [officer defendants] had every reason to believe the robbers would continue to harm hostages and endanger the public if they failed to take action. As in *Brown*, *Hernandez*, and *Lopez*, under the totality of the circumstances in this case, [officer defendants'] conduct was reasonable as a matter of law."

Judgment was thereafter entered in favor of all defendants. This appeal followed.

DISCUSSION

I

***Summary Judgment Principles***

We begin by summarizing several principles that govern the grant and review of summary judgment motions under section 437c of the Code of Civil Procedure.

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of

17

law.  [Citation.]  The burden of persuasion remains with the party moving for summary judgment.  [Citation.]"  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*); Code Civ. Proc., § 437c, subd. (c).)  Thus, a defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  [Citation.]"  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (o).)  Such a defendant also "bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists.  Once the initial burden of production is met, the burden shifts to [plaintiff] to demonstrate the existence of a triable issue of material fact."  (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1250.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo."  (*Kahn*, *supra*, 31 Cal.4th at p. 1003.)  "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny.  [Citation.]  We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]"  (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

## II

### *Preliminary Matters*

Two preliminary matters must be addressed before we can move onto the propriety of the trial court's grant of summary judgment for the officer defendants and the City.  First, did the trial court abuse its discretion in sustaining the City's hearsay

18

objection to three conclusions contained in the Police Foundation's after-incident report? And second, did the trial court misapply the Government Claims Act to improperly limit the scope of Koussaya's claims? We address each in turn and conclude the answer to both is yes.

## A.

### *Exclusion of Police Foundation Conclusions*

The Police Foundation, at the request of Chief Jones, conducted a review of the SPD response to the bank robbery and the pursuit that followed. The result of the review was a 60-page report titled "A Heist Gone Bad: A Police Foundation Critical Incident Review of the Stockton Police Response to the Bank of the West Robbery and Hostage-Taking." In paragraphs 114 through 116 of Koussaya's separate statement of additional material facts, she relied on three conclusions contained in this report. Specifically, the report concluded: (1) "the number of officers involved in the pursuit led to confusion and a lack of control"; (2) "there was an absence of direction from supervisors and no planned response for when the suspect vehicle stopped"; and (3) " 'the lack of planning, along with the number of officers involved[,] created a level of chaos that was difficult to manage and overcome.' " The City objected to these paragraphs of Koussaya's separate statement on hearsay grounds. The trial court sustained the objections. We conclude this was an abuse of discretion.

With many exceptions, hearsay evidence, i.e., "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is inadmissible. (Evid. Code, § 1200.) Two related exceptions are set forth in Evidence Code sections 1221 and 1222. First, a hearsay statement offered against a party is not inadmissible "if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth." (Evid. Code, § 1221.) Second, a hearsay statement offered against a party is not inadmissible if "[t]he statement was made

19

by a person authorized by the party to make a statement or statements for [that party] concerning the subject matter of the statement" and "[t]he evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence." (Evid. Code, § 1222.)

Here, Koussaya does not dispute she relied on three out-of-court statements contained in the Police Foundation report for the truth of the matters stated therein, but argues the statements fall within the adoptive admission exception. We agree the statements are admissible, but expand upon her reasoning to address a second potential layer of hearsay. The first layer is comprised of the statements contained in the Police Foundation report. These statements were offered against a party, i.e., the City, and therefore applicability of the adoptive admission exception turns on whether or not the City, "with knowledge of the content thereof, has by words or other conduct manifested [its] adoption or [its] belief in [the statements'] truth." (Evid. Code, § 1221.) Chief Jones testified in his deposition that he did so at a press conference. This is the second potential layer of hearsay. However, Chief Jones's out-of-court statement is not being used to prove the truth of the matter stated, i.e., that he in fact agreed with the Police Foundation's conclusions, because what is important for the adoptive admission exception is not the truth of the manifestation of belief, but simply whether such a manifestation was made. It was.

All that remains is to determine whether or not Chief Jones did so on behalf of the City. We have no difficulty concluding the Chief of Police was authorized to make statements on behalf of the City concerning the conduct of police officers under his

20

command.[7]  Accordingly, the City, acting through Chief Jones, adopted the conclusions of the Police Foundation report.  (See, e.g., *In re Automobile Antitrust Cases I and II* (2016) 1 Cal.App.5th 127, 149 [" 'textbook example' of an adoptive admission" where an officer of defendant corporation, acting on behalf of corporation, manifested his belief in the accuracy of certain out-of-court statements, and presumably would have corrected any perceived errors in the statements].)

The trial court abused its discretion in sustaining the City's hearsay objection to paragraphs 114 through 116 of Koussaya's separate statement of additional material facts.  However, for reasons we explain later in this opinion, even taking these paragraphs into account, the City was still entitled to judgment as a matter of law.  The evidentiary error was therefore harmless.

**B.**

***Application of the Government Claims Act***

Koussaya also claims the trial court misapplied the Government Claims Act to improperly limit the scope of her claims.  We agree.

"[S]ection 945.4 provides that 'no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with . . . Section 910 . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board . . . .'  Section 910, in turn, requires that the claim state the 'date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted' and provide '[a] general description of the . . . injury, damage or loss incurred so far as it may be known at the time of presentation of the claim.' "  (*Stockett v.*

---

[7]  For this reason, even if Chief Jones's statement at the press conference is properly considered hearsay, it would fall within the authorized admission exception of Evidence Code section 1222, set forth above.

*Association of Cal. Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441, 445, fns. omitted (*Stockett*).)

"The purpose of these statutes is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.' [Citation.] Consequently, a claim need not contain the detail and specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to have done.' [Citations.] As the purpose of the claim is to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions [citation], the claims statute 'should not be applied to snare the unwary where its purpose has been satisfied' [citation]." (*Stockett*, *supra*, 34 Cal.4th at p. 446.)

In order to comply with these provisions, the claim need not specify each act or omission later set forth in the complaint. "A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an 'entirely different set of facts.' [Citation.] Only where there has been a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim,' have courts generally found the complaint barred. [Citation.] Where the complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint. [Citation.]" (*Stockett*, *supra*, 34 Cal.4th at p. 447.)

For example, in *Blair v. Superior Court* (1990) 218 Cal.App.3d 221 (*Blair*), the plaintiff sued the Department of Transportation to recover damages for injuries sustained in an automobile accident involving an icy roadway. The tort claim she filed stated the act or omission causing injury was negligent maintenance and construction of the highway, citing specifically the defendant's failure to sand the roadway to prevent ice

22

buildup. (*Id*. at p. 223.) In addition to the failure to sand, the subsequent complaint alleged the highway and adjoining property was defective because it did not have a required guard rail, the slope of the roadway contributed to the danger of vehicles being carried off of the highway and into roadside trees, and there were no warning signs. (*Id*. at p. 224.) The trial court granted the defendant's motion to strike the additional allegations, concluding they "predicated liability on facts different from those set forth in the claim." (*Id*. at p. 223.)

We issued a writ of mandate directing the trial court to vacate its order granting the motion. (*Blair*, *supra*, 218 Cal.App.3d at p. 227.) As we explained, "the claim and the complaint . . . are premised on essentially the same foundation, that because of its negligent construction or maintenance, the highway at the scene of the accident constituted a dangerous condition of public property." (*Id*. at p. 226.) Rejecting the defendant's argument that the sole basis of liability asserted in the claim was the failure to sand or otherwise prevent ice buildup, we noted the claim generally asserted negligent construction and maintenance of the highway and explained: "A charge of negligent construction may reasonably be read to encompass defects in the placement of highway guard rails, slope of the road, presence of hazards adjacent to the roadway or inadequate warning signs." (*Ibid*.)

In contrast, *Fall River Joint Unified School Dist. v. Superior Court* (1988) 206 Cal.App.3d 431 (*Fall River*) involved an attempt by the plaintiff to premise liability on a new legal theory based on factual allegations not contained in the claim previously filed. There, the plaintiff was a minor who was injured when his head was struck by a steel door on his high school campus. (*Id*. at p. 433.) The tort claim stated his injury was caused by the dangerous and defective condition of the door. However, in the minor's subsequent complaint, in addition to two causes of action alleging the school district knowingly allowed a dangerous condition to exist on public property and negligently maintained the school premises, the minor asserted a separate cause of action for

23

negligently failing to supervise students whose horseplay allegedly caused the minor's collision with the door. (*Id*. at p. 434.) We held the school district was entitled to judgment on the pleadings with respect to this additional cause of action because the new cause of action "patently attempt[ed] to premise liability on an entirely different factual basis than what was set forth in the tort claim." (*Id*. at p. 435; see also *Donohue v. State of California* (1986) 178 Cal.App.3d 795, 804 (*Donahue*) [tort claim stating Department of Motor Vehicles negligently allowed uninsured motorist to take driving exam did not fairly encompass cause of action alleging negligent supervision by the driving instructor during that exam].)

Here, Koussaya's tort claim provided a general description of the bank robbery and events leading to her being taken hostage, including the initial confrontation between the robbers and "unknown officers of the [SPD] who had guns drawn and pointed at the robbers," causing the robbers to retreat back into the bank with their initial hostage and take two additional hostages, including Koussaya. The claim then described the "high speed chase" that "predictably ensued," including "as many as 33 [SPD] officers" firing at the fleeing vehicle while Koussaya and another hostage were still in the vehicle. Later, the claim stated "several [SPD] officers shot at the car," causing Koussaya to ultimately "jump from the car when the car was traveling at no less than 50 miles per hour" because she "[f]ear[ed] that she would be killed by shots fired into the car by police officers." The claim asserted: "As a result of the conduct, indifference, containment and pursuit tactics of unknown police officers of the City of Stockton and their open, obvious and confrontational presence at the bank, [Koussaya] was taken as a hostage and exposed to untold physical and emotional harm and loss, the same of which caused and continues to cause [Koussaya] physical and emotional harm and loss." The claim further listed the City, SPD, and multiple individual officers as those against who she believed she could maintain causes of action for assault, battery, IIED, negligence, and violation of Koussaya's constitutional rights. Finally, the claim set forth Koussaya's injuries.

24

Koussaya's subsequent complaint asserts assault, battery, IIED, and negligence as causes of action against two individual officers and vicariously against the City, supporting those causes of action against the City with additional factual allegations regarding the police response at the bank and the ensuing pursuit. For example, the complaint alleges: "[T]he City of Stockton's police officers arrived at the Bank of the West with lights on and took positions that were in full view of the bank robbers[,] . . . forc[ing] the gunmen back into the bank, where they then took hostages, including [Koussaya and Holt-Singh]." The complaint also alleges: "During the ensuing pursuit, more and more police officers from defendant City of Stockton joined in the chase, and thereby escalated and continued to escalate the desperation of the robbers as they attempted to evade the police. There was no established chain of command, no established course of action, no limit imposed on the number of officers from [SPD] who joined in the pursuit, no rules established to contain or diffuse the pursuit and general disregard for the well-being and safety of [Koussaya] and Holt-Singh."

Relying on *Fall River* and *Donahue*, the trial court ruled Koussaya did not preserve any claim regarding tortious conduct during the robbery response at the bank except with respect to confronting the robbers at gunpoint, and further ruled she did not preserve any claim regarding tortious conduct during the pursuit except with respect to Captain Anderson and Officer Webb shooting at Martinez in the Explorer. We disagree on both counts. Unlike *Fall River* and *Donahue*, Koussaya is not attempting to hold the City liable based on a new theory supported by facts not included in the tort claim. Instead, like *Blair*, Koussaya's complaint adds further factual detail to the same claims raised in the tort claim, and those claims were "predicated on the same fundamental facts set forth in the complaint." (*Blair*, *supra*, 218 Cal.App.3d at p. 226.) Specifically, the tort claim asserted Koussaya possessed claims against individual officers and the City for assault, battery, IIED, and negligence based on officer conduct during "their open, obvious and confrontational" response to the bank robbery and based on their "pursuit

25

tactics" during the high-speed chase that followed.  The complaint contains additional factual allegations of officer conduct during the bank response and pursuit much like the complaint in *Blair* contained additional factual allegations of defective highway conditions.  However, in both cases, the causes of action alleged in the complaint are based on the same fundamental facts supporting liability on the same legal theory or theories raised in the tort claim.[8]

The trial court erred in concluding otherwise.  Nevertheless, as we explain later in this opinion, even taking these additional factual allegations and supporting evidence into account, the City was still entitled to judgment as a matter of law.

### III

### *The Officer Defendants' Motion*

Although the causes of action asserted against the officer defendants (assault, battery, IIED, & negligence) have distinct elements, we need not address each cause of action individually.  This is because the underlying basis of the officers' alleged liability, whether for intentional tort or negligence, is the assertion that these officers unreasonably used deadly force in shooting at the Explorer with Koussaya in the vehicle, causing her to jump out of the Explorer and sustain serious injuries.  (See, e.g., *Brown*, *supra*, 171 Cal.App.4th at pp. 527, 534 [state law battery claim against a peace officer is a counterpart to a federal claim of excessive use of force and requires proof that the officer's use of force was unreasonable; where use of force was reasonable, no liability for either battery or negligence as a matter of law].)  We conclude there is no triable issue of material fact with respect to whether the officer defendants unreasonably fired at

---

[8]    Had Koussaya not expressly disclaimed any attempt to hold the City directly liable for negligent training and supervision of its police officers, we might well hold certain paragraphs of the complaint suggesting such a theory of liability are beyond the scope of the tort claim.  However, because Koussaya has disavowed such a theory, we need not decide the matter.

Martinez in the back of the Explorer during the pursuit. As we explain immediately below, based on the totality of circumstances surrounding the shootings, each officer defendant was entitled to judgment as a matter of law.

**A.**

***Legal Principles Governing the Use of Deadly Force by Law Enforcement***

At the time of the events at issue in this case, Penal Code section 835a provided that a peace officer who has reasonable cause to make an arrest "may use reasonable force to effect the arrest, to prevent escape[,] or to overcome resistance," and "need not retreat or desist from his [or her] efforts by reason of the resistance or threatened resistance of the person being arrested." (Former Pen. Code, § 835a; Stats. 1957, ch. 2147, § 11, p. 3807.)

Effective January 1, 2020, this section was amended to provide:

"(a) The Legislature finds and declares all of the following:

"(1) That the authority to use physical force, conferred on peace officers by this section, is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Legislature further finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law.

"(2) As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

"(3) That the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

27

"(4) That the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.

"(5) That individuals with physical, mental health, developmental, or intellectual disabilities are significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement.

"(b) Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

"(c)(1) Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:

"(A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person.

"(B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

"(2) A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.

"(d) A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this subdivision, 'retreat' does not mean tactical repositioning or other deescalation tactics.

"(e) For purposes of this section, the following definitions shall apply:

"(1) 'Deadly force' means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

"(2) A threat of death or serious bodily injury is 'imminent' when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

"(3) 'Totality of the circumstances' means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force." (Pen. Code, § 835a.)

Relevant portions of this amended section are declaratory of preexisting case law. Our Supreme Court "has long recognized that peace officers have a duty to act

29

reasonably when using deadly force" and that "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances," including "the tactical conduct and decisions leading up to the use of deadly force." (*Hayes*, *supra*, 57 Cal.4th at pp. 626, 629; see, e.g., *Olin*, *supra*, 24 Cal.3d at pp. 634, 637; *Grudt*, *supra*, 2 Cal.3d at pp. 585-588.)

For example, in *Grudt*, a wrongful death action, our Supreme Court held the trial court erred in removing negligence from the jury's consideration where two plainclothes police officers, who were patrolling a high-crime area in an unmarked car at night, attempted to pull over the hearing-impaired decedent, Grudt, without using the vehicle's red light or siren, followed by two other plainclothes officers in another unmarked car joining in pursuit until Grudt's car stopped at an intersection, at which point one of these officers "alighted from his vehicle[,] . . . loaded his double-barreled shotgun as he approached Grudt's car," and "tapped loudly on the closed left front window . . . with the muzzle of his shotgun." (*Grudt*, *supra*, 2 Cal.3d at p. 581.) This caused Grudt to panic and accelerate towards one of the other plainclothes officers, who was also out of the unmarked car with his gun drawn; Grudt was killed when both officers fired at his car, the latter officer in self-defense and the former in defense of his fellow officer. (*Id*. at pp. 581-582.) Viewing the evidence favorably to the plaintiff, Grudt's widow, the court concluded "the evidence . . . raised a reasonable doubt whether [the officers who shot Grudt] acted in a manner consistent with their duty of due care when they originally decided to apprehend Grudt, when they approached his vehicle with drawn weapons, and when they shot him to death. '[The] actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law.' [Citation.]" (*Id*. at p. 587.)

Elaborating on this point in *Hayes*, our Supreme Court explained "the shooting in *Grudt* appeared justified *if examined in isolation*, because the driver was accelerating his car toward one of the officers just before the shooting. Nevertheless, we concluded that the totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent. [Citation.] In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." (*Hayes*, *supra*, 57 Cal.4th at p. 629-630; see also *Olin*, *supra*, 24 Cal.3d at pp. 636-637 [substantial evidence supported finding that two arson investigators unreasonably used deadly force against a fleeing suspected arsonist, including evidence of preshooting conduct; jury could have found the investigators unreasonably identified the decedent, "the first man they saw" after seeing someone start a fire, unreasonably failed to warn him deadly force would be used, and unreasonably failed to attempt other means of apprehension].)

However, although an officer's preshooting conduct must be considered as part of the totality of circumstances surrounding the use of force, " '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' [Citation.]" (*Hayes*, *supra*, 57 Cal.4th at p. 632.) "The standard for evaluating the unreasonable use of force reflects deference to the split-second decisions of an officer and recognizes that, unlike private citizens, officers may use deadly force. An officer ' " 'may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance.' " ' [Citations.] ' " 'Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." ' " ' [Citation.]" (*Lopez*, *supra*, 196 Cal.App.4th at p. 685.)

31

" ' "We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." [Citation.]' [Citation.] Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable 'gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law.' [Citation.]" (*Brown*, *supra*, 171 Cal.App.4th at p. 528.)

We finally note that " '[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability . . . .' [Citation.]" (*Hayes*, *supra*, 57 Cal.4th at p. 632.) "Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation. Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find [the use of force was unreasonable]." (*Ibid*.)

**B.**

*Analysis*

We now apply the foregoing legal principles to the largely undisputed facts of this case. Based on the totality of circumstances surrounding the officer defendants' conduct, we conclude their respective uses of deadly force were reasonable as a matter of law.

Generally, a police officer's use of deadly force against a suspect will be considered reasonable where " ' " 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' [Citations.]" [Citation.]' [Citation.] ' "Thus, 'an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions

indicate an intent to attack.' " [Citation.]' [Citation.]" (*Brown, supra*, 171 Cal.App.4th at p. 528; *Lopez, supra*, 196 Cal.App.4th at p. 689.)

For example, in *Brown*, the plaintiff was an innocent bystander who was struck by bullet fragments when a police officer, Ransweiler, fired five rounds at a fleeing murder suspect, Ojeda, who drove onto a curb in an attempt to evade arrest and was heading directly towards Ransweiler and another officer, Baldwin. Concluding the shooting was reasonable as a matter of law, our colleagues at the Fourth Appellate District explained: "Ojeda's actions clearly indicated his intent to harm the officers. In response to a strong show of force by officers in raid gear who ordered Ojeda to get out of his vehicle, Ojeda instead drove his vehicle up onto the sidewalk adjacent to the strip mall, 'gunned' the engine, and drove directly toward Ransweiler and Baldwin. After Ransweiler dove out of the way, he saw Baldwin fall to the ground while still in front of Ojeda's vehicle. Ransweiler's fear that Ojeda would run over Baldwin was reasonable given these circumstances. [¶] Once Ojeda took this extreme action in response to police orders to surrender, Ransweiler acted reasonably in shooting at him to attempt to stop Ojeda from harming Baldwin or a third party, or escaping. Ransweiler's use of force was not excessive or unreasonably dangerous relative to the danger Ojeda's actions posed. Ransweiler shot at Ojeda five times, from a relatively close distance. Ransweiler did not shoot into a crowd. Rather, he shot in a direction away from buildings in the strip mall. In view of the exigency of the circumstances he was facing, Ransweiler met his duty to use reasonable care in employing deadly force." (*Brown, supra*, 171 Cal.App.4th at pp. 528-529.)

Here, as in *Brown*, both Captain Anderson and Officer Webb had probable cause to believe Martinez posed a significant threat of death or serious physical injury to the pursuing officers. Moreover, police officers were not the only lives placed in danger by Martinez's conduct. Firing at the pursuing officers endangered the lives of countless innocent bystanders. No reasonable juror could conclude otherwise. When Anderson

33

and Webb fired at Martinez in an attempt to neutralize the imminent threat he posed to the lives of officers and innocent bystanders, they thereby endangered the lives of Koussaya and Holt-Singh inside the Explorer. That is not disputed. But no reasonable juror would conclude these actions were outside "the range of conduct that is reasonable under the circumstances." (*Brown*, *supra*, 171 Cal.App.4th at p. 537; see, e.g., *Lopez*, *supra*, 196 Cal.App.4th at pp. 689-691 [no substantial evidence of unreasonable use of deadly force where officers shot and killed the infant daughter of an armed suspect who was firing at the officers while holding the child].)

Addressing Anderson's situation more specifically, at the time he fired at Martinez in the back of the Explorer, Martinez had already fired an AK-47 assault rifle at multiple pursuing officers, disabling at least one patrol car. After Anderson positioned himself at the Morada Lane onramp, the Explorer exited the freeway and Martinez "put the AK-47 out towards the -- whatever would be coming around that corner next off the offramp." Anderson also testified in his deposition that the Explorer briefly stopped on the offramp when Martinez pointed the rifle out the back, indicating an intent to ambush the pursuing officers. Surveillance camera footage contradicts this testimony. However, this factual dispute is not material. Viewing the evidence in a light most favorable to Koussaya, as we must, and resolving the conflict in her favor, a reasonable officer in Anderson's position would nevertheless have been more than justified in believing Martinez had "the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury" (Pen. Code, § 835a, subd. (e)(2)) to the pursuing officers, as well as any innocent bystanders who happened to be in the line of fire, if he did not take immediate action.[9] The action Anderson took was also reasonable. Like *Brown*, Anderson's use of

---

[9]    Koussaya also relies on other evidence she argues "places Anderson's story into dispute," such as Anderson driving to Morada Lane rather than responding to the bank as he was directed, and his decision not to broadcast over the radio even though his stated

deadly force was neither excessive nor unreasonably dangerous in relation to the danger Martinez posed. Anderson quickly took aim and fired three rounds at Martinez, who responded by firing indiscriminately out of the back of the Explorer, followed by Anderson firing two additional rounds at Martinez in an attempt to neutralize the threat. Anderson's use of deadly force in these circumstances was reasonable as a matter of law.

Turning to the shots fired by Officer Webb, he was the lead pursuer at the time he fired at Martinez and did so in self-defense as his vehicle took gunfire from the AK-47 on the Benjamin Holt Drive exit ramp. Webb quickly pulled over, got out of his patrol car, and using the driver's side door to take aim, fired two rounds at Martinez from a distance of about 150 feet. Webb's actions were objectively reasonable under the circumstances. No reasonable juror could conclude otherwise.

Nevertheless, Koussaya argues the reasonableness of these officers' respective uses of deadly force cannot be determined on summary judgment because both officers violated an order from Lieutenant Ridenour not to shoot at the Explorer and also violated

---

purpose in driving to Morada Lane was "to serve as the 'eyes and ears' of the pursuit." Koussaya argues this evidence suggests Anderson's real purpose in driving to Morada Lane was "to make himself the 'hero' who stopped the pursuit by shooting the suspects." However, even assuming such a conclusion is supported by the evidence, whether or not Anderson harbored a subjective desire to be a hero is not the relevant question. Instead, as already indicated, the relevant question is whether a reasonable officer in Anderson's position would have believed Martinez had "the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person." (Pen. Code, § 835a, subd. (e)(2).) There is no real dispute that Martinez had such an ability, opportunity, and intent.

35

general orders issued by the SPD governing vehicle pursuits[10] and use of firearms.[11] We are not persuaded.

First, contrary to Koussaya's argument on appeal, the existence of an applicable general order does not establish the standard of care for using deadly force. That standard is set by *Hayes*: "officers have a duty to act reasonably when using deadly force" and "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances." (*Hayes*, *supra*, 57 Cal.4th at p. 629.) If a general order set the standard of care, then violation of the order would automatically mean a breach of the standard has occurred. That is not the law. Instead, as our Supreme Court has explained, general rules of an organization are "evidence that due care requires the course of conduct prescribed in the rule. Such rules implicitly represent an informed judgment as to the feasibility of certain precautions without undue frustration of the goals of the particular enterprise." (*Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472, 478.) Thus, although the general order regarding vehicle pursuits, and other general orders

---

**10** This general order provides: "The priorities of vehicle pursuits are as follows: [¶] 1. To prevent injury or death to innocent citizens. [¶] 2. To prevent injury or death to a police officer. [¶] 3. The apprehension of the suspect(s)." The order also cross-references the general order regarding use of firearms, relevant portions of which are set forth in the next footnote, and states with respect to terminating a pursuit: "Experience reveals that shooting at fleeing vehicles is generally ineffective, and the hazards are great. Decisions to fire at moving vehicles must be based on the most compelling circumstances."

**11** This general order provides: "Firearms will not be discharged under the following circumstances. [¶] . . . [¶] (4) At moving or fleeing vehicles involved in violations of the Vehicle Code (including felony violations such as 20001, 10851, 23105, etc.) unless necessary to defend the life of the officer or another person. Two facts make this necessary. [¶] (a) Experience has proven that shooting at moving vehicles is one of the most uncertain and hazardous shooting conditions in police work, particularly when the officer is in a moving vehicle. [¶] (b) Many vehicles involved in traffic violations are driven by persons whose age or reason for fleeing do not justify the use of firearms as means of apprehension."

discussed later in this opinion, do not establish the standard of care regarding the use of deadly force, such orders "may well be extremely useful to the trier of fact" in determining whether a particular use of deadly force, or officer conduct leading up to that use of force, violated the more "amorphous" standard of reasonableness. (*Ibid*.; *Grudt, supra*, 2 Cal.3d at pp. 587-588 [police tactical manual admissible as evidence relevant to the question of the reasonableness of the use of deadly force].)

Second, there is a factual dispute concerning whether or not Lieutenant Ridenour's order not to shoot at the Explorer applied to Captain Anderson, who was of a higher rank than Ridenour. However, resolving the matter in Koussaya's favor for purposes of the summary judgment motion, we nevertheless conclude violation of the order was reasonable as a matter of law in these specific circumstances. Again, Martinez had fired an AK-47 at pursuing officers prior to the two shooting incidents at issue in this appeal. He was aiming the assault rifle in the direction of his pursuers when Anderson fired. And he was actually firing at Webb when Webb returned fire in self-defense. For reasons already expressed, firing at Martinez in these circumstances was reasonable regardless of Ridenour's order.

Turning to the officers' purported violation of SPD general orders, as previously noted, a general order governing vehicle pursuits provides: "The priorities of vehicle pursuits are as follows: [¶] 1. To prevent injury or death to innocent citizens. [¶] 2. To prevent injury or death to a police officer. [¶] 3. The apprehension of the suspect(s)." According to Koussaya, this order requires "the safety of innocent civilians be prioritized over the safety of officers" and therefore prohibited Webb from prioritizing his own life over the lives of the innocent hostages by returning fire when Martinez fired at him. We are not persuaded the general order draws the sharp hierarchical distinctions Koussaya reads into it. Nor was the choice Webb faced on the offramp so clearly delineated between protecting his life over the lives of the hostages. As we have already explained, every time Martinez fired at pursuing officers he endangered the lives of innocent

37

civilians. Notwithstanding the danger returning fire posed to Koussaya and Holt-Singh, Webb's split-second decision to do so was not unreasonable as a matter of law. (See *Lopez*, *supra*, 196 Cal.App.4th at pp. 689-691.) The same reasoning applies to Anderson's decision to fire at Martinez in an attempt to prevent him from opening fire on the pursuing officers.[12]

Finally, Koussaya argues there is a material factual dispute regarding whether or not "Webb's own actions escalated the pursuit, leading [Martinez] to fire the shots which Webb returned." Specifically, Koussaya points to evidence supporting the following facts: "Webb knew there was air support to track the Explorer, making it unnecessary for him to follow so close as to draw fire. Yet he continued to follow the Explorer so closely that both air support and a fellow officer had to warn him to back off. As Webb exited the freeway onto Benjamin Holt, air support warned him the Explorer was stopped at a red light. Webb nevertheless closed in on the vehicle until [Martinez] began shooting." We acknowledge "preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." (*Hayes*, *supra*, 57 Cal.4th at p. 630.) That is not the case here.

---

[12]     Koussaya's reliance on the general order governing the use of firearms is misplaced because this order prohibits firing at a fleeing vehicle that is "involved in violations of the Vehicle Code (including felony violations such as 20001, 10851, 23105, etc.)" and the robbers in this case were not fleeing after a Vehicle Code violation, but after committing armed robbery, kidnapping hostages, and firing at police officers during their attempt to escape apprehension. Moreover, even if the general order applied to these facts, it has an exception where firing at the vehicle is "necessary to defend the life of the officer or another person." That exception clearly applies here. Also misplaced is Koussaya's reliance on the portion of the vehicle pursuit general order cross-referencing the foregoing order because it too allows an officer to fire at a moving vehicle under "compelling circumstances." For reasons already expressed, the circumstances facing Anderson and Webb were compelling as a matter of law.

*Hernandez*, *supra*, 46 Cal.4th 501 is instructive. There, several police officers shot and killed an unarmed man, Hernandez, who had led them on a high-speed chase at night, followed by a foot pursuit involving the use of a police dog. During the foot chase, Hernandez twice turned towards the pursuing officers, reached towards his waistband, and yelled either that he had a gun or that he did not have a gun. (*Id*. at pp. 506-507.) A federal court entered judgment in favor of the defendants on a civil rights claim for use of excessive force and dismissed a supplemental state law wrongful death claim arising out of the same incident. (*Id*. at p. 505.) Our Supreme Court held the federal judgment collaterally estopped Hernandez's surviving family members from relitigating the reasonableness of the shooting itself because that question was " 'precisely the issue resolved [against them] by the federal jury . . . .' " (*Id*. at p. 513.) However, because "state negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used" (*Hayes*, *supra*, 57 Cal.4th at p. 639), the court separately addressed whether the plaintiffs "could pursue a negligence claim 'on the theory that [the officers'] conduct leading up to the shooting, including the high-speed pursuit, foot chase, and release of a pursuit dog created an unreasonable risk of harm to themselves and Hernandez.' " (*Hernandez*, *supra*, 46 Cal.4th at p. 517.)

Reviewing the evidentiary record, our Supreme Court concluded the officers' preshooting conduct, as a matter of law, did not make the officers' use of deadly force unreasonable. In reaching this conclusion, the court first noted the officer who initially attempted to detain Hernandez was legally justified in doing so, and was further authorized to pursue him in order to make an arrest. (*Hernandez*, *supra*, 46 Cal.4th at pp. 518-519.) With respect to the high-speed pursuit, the court explained Vehicle Code

39

section 17004[13] prevented the individual officers from being "held civilly liable for Hernandez's death based on the manner in which they operated their vehicles during the chase." (*Hernandez,* at p. 519.) Nor did Vehicle Code section 17001[14] provide an exception to this general rule of immunity because Hernandez was not killed by the negligent or wrongful operation of a police vehicle, but rather by the shooting that "occurred well *after* the police stopped and exited their cars and chased Hernandez on foot." (*Hernandez,* at pp. 519-520.) Turning to the manner in which the officers pursued Hernandez on foot, the court explained the plaintiffs could not rely on the fact that they chased Hernandez into a darkened parking lot because it was Hernandez who chose where to run. (*Id.* at pp. 520-521.) Finally, the court concluded the use and release of a police dog on these facts was reasonable as a matter of law. (*Id.* at p. 521.)

Similarly, here, Officer Webb had every right to pursue the robbers in an attempt to apprehend them for several violent felonies, including armed robbery, kidnapping, assault with a deadly weapon, and attempted murder. He was not required to retreat or desist from his efforts to apprehend them on account of their violent resistance. (Pen. Code, § 835a, subd. (d).) To the extent Koussaya attempts to premise liability on the manner in which Webb operated his patrol car during the pursuit, i.e., by following at too close a distance, Vehicle Code section 17004 provides immunity. And as in *Hernandez,*

---

[13]    This section provides: "A public employee is not liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle while responding to an emergency call or when in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm or other emergency call." (Veh. Code, § 17004.)

[14]    This section provides: "A public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment." (Veh. Code, § 17001.)

Vehicle Code section 17001 does not apply because Koussaya's injuries were not caused by Webb's operation of the vehicle. In order for that section to apply, "it is not sufficient that a motor vehicle somehow be involved in the series of events that results in the injury. The injury must be proximately caused by the negligent 'operation of a motor vehicle.' " (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 923.) Here, Koussaya's injuries were not caused by Webb's operation of his patrol car, but rather by her decision to jump from the Explorer as it traveled at more than 50 miles per hour, well after Webb pulled over, got out of the car, and fired at Martinez in self-defense.

Koussaya does not persuade this court that the totality of either officer defendant's conduct transformed an otherwise reasonable use of deadly force into an unreasonable use of such force. The trial court properly granted these officers' motion for summary judgment.

## IV

### *The City's Motion*

We now turn to the trial court's grant of summary judgment for the City and conclude it was properly granted.

"When a party is injured by a tortfeasor and seeks to affix liability on the tortfeasor's employer, the injured party ordinarily must demonstrate either (1) the employer violated a duty of care it owed to the injured party and this negligence was a proximate cause of the resulting injury (the *direct* liability theory), or (2) the tortfeasor-employee was liable for committing the tortious conduct that caused the injury while acting within the course and scope of his or her employment (the *vicarious* liability theory). [Citation.] When the employer is a governmental agency, the statutory framework permits the injured party to pursue the *vicarious* liability theory in accordance with these general common law principles. [Citation.] However, the statutory framework requires, as a condition to the injured party's recovery on a *direct* liability theory against a governmental agency, that the injured party identify a 'specific statute

41

declaring [the entity] to be liable, or at least creating some specific duty of care' by the agency in favor of the injured party. [Citations.]" (*de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 247-248, fn. omitted (*de Villers*).)

As previously mentioned, although Koussaya's complaint contains allegations suggesting a direct liability theory, i.e., allegations that the City failed "to properly and adequately hire, train, retrain, supervise, and discipline its police officers," she has disclaimed any attempt to hold the City directly liable for her injuries. Nor would such a theory be successful. (See, e.g., *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1112-1113 [no statutory basis for declaring the public entity defendant directly liable for negligent hiring or supervision of officers] (*Munoz*), disapproved on another point in *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 639, fn. 1; see also *de Villers*, *supra*, 156 Cal.App.4th at pp. 252-253.) Thus, Koussaya's claims against the City are purely vicarious.

Section 815.2 sets out the rule regarding vicarious public entity liability: "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his [or her] employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his [or her] personal representative. [¶] (b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." In turn, "section 820 delineates the liability of public employees themselves: '(a) Except as otherwise provided by statute (including Section 820.2), a public employee is liable for injury caused by his [or her] act or omission to the same extent as a private person. [¶] (b) The liability of a public employee established by this part . . . is subject to any defenses that would be available to the public employee if he [or she] were a private person.' In other words, 'the general rule is that an employee of a public entity is liable for his [or her] torts to the same extent as a private person (§ 820, subd. (a)) and the public entity is

42

vicariously liable for any injury which its employee causes (§ 815.2, subd. (a)) to the same extent as a private employer (§ 815, subd. (b)).' [Citation.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 868.) Finally, we note section 820.2 provides generally for immunity from liability "for an injury resulting from [a public employee's] act or omission where the act or omission was the result of the exercise of the discretion vested in him [or her], whether or not such discretion be abused."

Under these provisions, in order for vicarious public entity liability to attach, a public employee, either named as a defendant or at least "specifically identified" by the plaintiff, must have engaged in an act or omission giving rise to that employee's tort liability. (*Munoz*, *supra*, 120 Cal.App.4th at p. 1113.) We have already held summary judgment was properly granted as to the officer defendants in this case. Accordingly, to the extent Koussaya's claims are vicarious to the officer defendants' actions in this case, the City's motion was also properly granted. As the *Munoz* court explained: "If the agent or employee is exonerated, the principal or employer cannot be held vicariously liable." (*Ibid*.)

This conclusion does not dispose of the entirety of Koussaya's claims against the City, however. She argues the City may be held vicariously liable for the actions of other officers, beginning with those who responded to the bank in violation of a general order governing officer response to a robbery alarm,[15] and continuing with those involved in

---

[15] This general order required responding officers to "secure the perimeter of the bank and or business and advise the Telecommunications Center of their location at the scene." The general order also provides: "Units will respond 'Code 3' and may discontinue the use of red lights and siren when close to arrival and respond the remainder of the distance in accordance with traffic laws. The exact time to discontinue 'Code 3' response is to be decided by each individual member assigned to respond, taking into consideration the fact a hostage situation could be initiated by police response being recognized by the robbers."

43

the subsequent high speed pursuit, including Lieutenant Rose who attempted to ram the Explorer with the SWAT team's armored vehicle, unidentified officers other than Anderson and Webb who purportedly also fired on the Explorer while Koussaya was inside, and SPD commanders who failed to properly oversee the pursuit or effectively communicate who was in charge in violation of a general order governing officer response to an active shooter situation.[16]

The only officer specifically identified by Koussaya who responded to the bank was Officer Sandoval. Taking into account the general order noted above, the trial court thoroughly explained why Sandoval's conduct at the bank did not amount to assault, battery, IIED, or actionable negligence. The trial court also thoroughly explained why officers involved in the pursuit could not be held liable for these torts, including the conclusion that the decision to engage in pursuit of a fleeing suspect and decisions regarding chain of command are discretionary, and therefore subject to immunity under section 820.2. We decline to proceed on a claim-by-claim basis explicating our agreement with the trial court on these points because Koussaya's appellate briefing does not specifically argue that any individual officer, other than Anderson and Webb, committed an assault or battery against her, intentionally engaged in extreme or outrageous conduct causing her emotional distress, or negligently used deadly force

---

[16] This general order provides: "One initial officer must take charge of the active shooter incident. Assumption of tactical responsibility may be based on rank, expertise, or seniority. However, it must be made immediately clear to both dispatch and other officers, who is in charge. An officer of superior rank who is on scene and fully briefed may ultimately assume incident command. Any change in incident command will be made known to dispatch and other officers." The order further provides: "No action will be taken that is unplanned or without controls. Command will be assumed by the first officer who will initiate the situation analysis and determine initial deployment of responding resources. At least one person possessing all available information on tactical plans will remain at the Command Post to brief arriving personnel. Command personnel en route to the incident will monitor the radio to gain information."

44

causing her injuries. Again, if a specific individual officer has not engaged in an act or omission giving rise to that officer's tort liability, the City cannot be held vicariously liable. (*Munoz*, *supra*, 120 Cal.App.4th at p. 1113.)

Instead, Koussaya argues the combined actions of the officers involved in the robbery response and the pursuit contributed to "a continuing and escalating series of events" and "must be viewed as a continuum of circumstances ultimately leading to [her] being forced to throw herself from a speeding vehicle and suffering severe injuries to avoid being killed by the police." In making this argument, she attempts to extend the rule articulated in *Hayes*, *Olin*, and *Grudt* (i.e., tactical conduct and decisions made by law enforcement preceding the use of deadly force are relevant considerations in determining whether the subsequent use of deadly force was unreasonable) well beyond the facts of those cases. In *Hayes* and *Grudt*, the officers who used deadly force were the same officers whose conduct preceding the use of force was held to be relevant to the reasonableness determination. (*Hayes*, *supra*, 57 Cal.4th at pp. 626, 637; *Grudt*, *supra*, 2 Cal.3d at pp. 581-582, 587-588.) In *Olin*, one officer used deadly force and the preceding conduct of that officer and his partner, acting together in an attempt to apprehend the suspect, was held to be relevant to the reasonableness determination. (*Olin*, *supra*, 24 Cal.3d at pp. 631-634, 636-637.) Thus, our Supreme Court has held the preshooting conduct of the officers involved in the use of deadly force is relevant to the question of whether that use of deadly force was reasonable.

Here, Anderson and Webb were the only officers whose use of deadly force is alleged to have caused Koussaya to jump from the Explorer and sustain injuries.[17] We

---

[17]   Although Lieutenant Rose's attempt to ram the Explorer with the armored vehicle qualifies as a use of deadly force, and Koussaya now claims this conduct also contributed to her decision to jump from the Explorer, her complaint does not mention the ramming attempt or allege it caused her to jump. "The complaint serves to delimit the scope of the issues before the court on a motion for summary judgment [citation], and a party cannot

45

have already disposed of Koussaya's specific arguments regarding their preshooting conduct. Koussaya cites us to no authority, nor have we found any on our own, extending the reasoning of the foregoing cases to a situation such as this one, where the conduct of officers not involved in the ultimate use of deadly force is relied upon to show that an otherwise reasonable use of deadly force was unreasonable. We decline to extend these cases to the facts of this one.

Stated simply, because Anderson and Webb are not liable for Koussaya's injuries allegedly caused by their respective uses of deadly force, the City cannot be held vicariously liable for their conduct. Other officer conduct was not actionable as a matter of law for reasons capably expressed by the trial court. Thus, the City cannot be held vicariously liable for their conduct. Finally, to hold the City liable not because any individual officer is liable, but rather because the SPD's collective response to the bank robbery and management of the subsequent pursuit was unreasonable and resulted in Koussaya's injuries, as Koussaya appears to be arguing under the guise of vicarious

---

successfully resist summary judgment on a theory not pleaded [citation]." (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1576.) Moreover, Koussaya has presented no evidence that she knew of the attempt to ram the Explorer at the time she jumped or that this failed attempt caused her to do so. Indeed, in Koussaya's deposition testimony, she stated she decided to jump when she became aware of the SWAT team's participation in the pursuit and did so because police were shooting at the Explorer and she was afraid the SWAT team would kill her when the pursuit came to an end. She did not mention the ramming attempt. Additionally, although Koussaya also argues other officers shot at the Explorer while she was inside, she does not specifically identify who these officers were. (*Munoz*, *supra*, 120 Cal.App.4th at p. 1113 ["the doctrine clearly contemplates that the negligent employee whose conduct is sought to be attributed to the employer at least be specifically identified"].) Other than her speculative statement during her deposition that, in addition to the "five to ten" times she heard bullets strike the Explorer (Anderson and Webb fired a total of seven rounds), she also heard additional shots fired "from further away," Koussaya produced no evidence that any SPD officer other than Anderson and Webb fired at the Explorer while she was inside. We agree with the trial court's conclusion that "[w]ithout some evidence of the source or circumstances of those shots, [Koussaya] has failed to raise a triable issue" regarding shots fired by any other officer.

46

liability, would improperly impose direct liability on the City in the absence of specific statutory authority to do so.

We conclude the trial court properly granted the City's motion for summary judgment.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　HOCH, J.


We concur:


　/s/
BLEASE, Acting P. J.


　/s/
HULL, J.